Michael CARR, Plaintiff,

v.

LOCAL UNION 1593, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS; and International Brotherhood of Electrical Workers, Defendants.

No. A1–04–018.

United States District Court, D. North Dakota, Southwestern Division.

May 18, 2005.

Moody M. Farhart, Minot, ND, for Plaintiff.

Patrick A. Donovan, Hazen, ND, Mark G. Schneider and Daniel E. Phillips, Fargo, ND, Robert D. Kurnick, Washington, DC, for Defendant.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

HOVLAND, Chief Judge.

Before the Court are two separate Motions for Summary Judgment filed by each of the two defendants, Local Union 1593 and the International Brotherhood of Electrical Workers, on February 1, 2005, and January 31, 2005, respectively. The Plaintiff has filed a response opposing the motions. For the reasons set forth below, the Court grants the motions.

## I. *BACKGROUND*

The plaintiff, Michael Carr, is an employee of the Dakota Gasification Company

("Dakota Gasification") in Beulah, North Dakota. Carr is part of a bargaining unit represented by the International Brotherhood of Electrical Workers Local Union 1593 ("Local 1593") and is covered by a collective bargaining agreement. Carr also named the International Brotherhood of Electrical Workers ("IBEW") as a defendant.[1]

### A. COLLECTIVE BARGAINING AGREEMENT

In 2000, Local 1593 was chosen by employees of Dakota Gasification to represent them in collective bargaining and certified by the National Labor Relations Board as the exclusive bargaining representative of any Dakota Gasification employee. In 2000 and 2001, Local 1593 negotiated its first collective bargaining agreement with Dakota Gasification. At Local 1593's request, James Simmons, an IBEW International Representative assisted in the negotiations.

On June 11–12, 2001, the prospective membership of Local 1593 ratified a proposed collective bargaining agreement. The notice which informed Dakota Gasification Local 1593 members of the ratification meeting, stated "[i]t is only fair to inform you that some of the sections are still in dispute with the Company."

On July 10, 2001, Local 1593 and Dakota Gasification signed a collective bargaining agreement. The agreement included Exhibit C, which reads as follows:

Any term or condition of employment not specifically addressed in this contract shall be governed by existing Company policies, most of which are located in a document entitled "Dakota Gasification Company Employee Guidelines."

The Company reserves the right to change such policies and Guidelines for business reasons without negotiating with the Union, but the Company shall notify the Union when such are made.

Exhibit C was not a part of the ratified collective bargaining agreement signed by Local 1593 on June 11–12, 2001.

In between the ratification of the proposed agreement in June 2001, and the signing of the collective bargaining agreement in July 2001, Carr alleges that a "secret meeting" was held with representatives from Local 1593, IBEW, and Dakota Gasification. Both parties seem to acknowledge that a meeting took place on that date, but the specifics about what happened at the meeting is in dispute. Carr contends that changes were secretly made to the contract which gave Dakota Gasification unlimited power to change policies without bargaining with Local 1593, and members of Local 1593 were not told that they were getting a different contract from the one which they ratified. Carr did not know about the meeting at the time it occurred, but did learn about it at a later date.

On or about July 20, 2001, Local 1593 sent a letter to Dakota Gasification employees informing them that the signed collective bargaining agreement differed from the earlier ratified version. Specifically, the letter explained that "[s]ome sections of the contract are different than what we proposed to the body, but this was Management's version of what transpired." The letter also stated as follows:

"The contract also references Company Policy. They cannot change these policies without negotiating with you. There are also some areas that are not mentioned because we couldn't get DGC to move on these issues. So if they are

---

1. Carr named the American Federation of Labor–Congress of Industrial Organizations (ALF–CIO) as a defendant. The ALF–CIO was dismissed from the lawsuit on June 17, 2004.

not covered in the contract, past practice will take precedence."

Carr received a copy of this letter.

On or about August 31, 2001, Local 1593 sent another letter to Dakota Gasification employees, along with a copy of the signed collective bargaining agreement. In the letter, Local 1593 admitted to "hearing many complaints that this is not the contract that you voted on" and recognized that the signed bargaining agreement "is not word for word what was presented to you at the ratification meetings." Carr also received a copy of this letter.

## B. *JOB TRANSFER*

In February 2002, Carr was working in the Oxygen Unit at Dakota Gasification. He was classified as a Tech V. On February 12, 2002, Dakota Gasification posted a memorandum changing the transfer policy effective immediately. The memorandum stated that when grade and/or pay rates appear on a job posting, any applicant whose grade and pay rate is above those listed in the job posting will be subject to a two-grade reduction. On the same day, Dakota Gasification posted a notice for two available positions in Wastewater and Product Loading. The notice listed the position titles as "Operations Field Technician I." Carr read the posting and the memorandum.

Carr applied for a transfer to the Wastewater Unit within Dakota Gasification. The Wastewater Unit position was classified as a Tech I. Carr believed he would retain his Tech V classification after the transfer because that had been the practice at Dakota Gasification. Carr accepted

the transfer. On March 11, 2002, when Carr transferred to the Wastewater Unit, his pay grade was reduced to a Tech III classification.

## C. *GRIEVANCES (FILED AND UNFILED)*

On March 28, 2002, Local 1593 filed a grievance on Carr's behalf alleging that Dakota Gasification violated the collective bargaining agreement by reducing his pay grade from Tech V to Tech III. The grievance was denied in Steps One, Two, and Three. Carr then requested an arbitration hearing and a hearing was held on March 5, 2003.

In the meantime, Carr was told that if he did not test to maintain the Tech III pay grade by March 10, 2003, he would be reduced to a Tech I. Carr did not take the test, and on March 10, 2003, his pay grade was reduced to a Tech I. On March 24, 2003, Local 1593 filed another grievance on Carr's behalf alleging that Dakota Gasification violated the collective bargaining agreement by reducing his pay grade from Tech V to Tech III.

During this same time period (February and March of 2003), Dakota Gasification refused Carr's request to convert his vacation leave to sick leave. Instead, Dakota Gasification asked Carr to produce additional information about his illness. Carr did not provide the requested information and did not grieve the decision.

On April 25, 2003, the arbitrator issued a decision in favor of Dakota Gasification on Carr's first grievance.[2] On approximately the same day, Carr's second grievance was denied.[3] Local 1593 did not pur-

---

2. To refresh, the issue as framed by the arbitrator in Carr's first grievance was as follows: Did the Company violate the Contract when it reduced the Greivant from Tech Level V to Tech Level III when he voluntarily bid into a Tech Level I position after the Company gave notice that the prior policy as to

down grades on transfers was being changed? If so, what is the appropriate remedy?

3. Again, the issue in the second grievance was whether Dakota Gasification violated the col-

sue arbitration on the matter, letting the ten-day time period to process the grievance to arbitration elapse.

In May of 2003, Dakota Gasification gave Carr his work appraisal. The appraisal, dated May 18, 2003, gave Carr an overall evaluation rating of "Needs Improvement." This rating was down from Carr's previous overall rating of "Commendable." Carr saw the evaluation as a threat from management, but did not ask Local 1593 to file a grievance on the issue.

On September 10, 2003, Dakota Gasification announced a change in policy by way of a memorandum with the subject line being "Technician Progression Time Line." The memorandum explained that operations technicians would be expected to progress through various pay grades in a specific amount of time. Failure to do so could result in disciplinary action. Local 1593 did not grieve the policy decision, nor did Carr ask it to do so.

### D. PRESENT DISPUTE

On February 14, 2004, Carr served a summons and complaint on Local 1593 and IBEW. In his complaint, Carr set forth four claims (1) breach of contract; (2) breach of the duty of fair representation; (3) misrepresentation and reliance; and (4) violations of the North Dakota Labor–Management Relations Act. The Court has previously partial granted summary judgment on Carr's first, third, and fourth claim. *See* Docket Nos. 34 and 50. As a result, Carr's sole remaining claim is whether Local 1593 and IBEW breached their statutory duty of fair representation.

On January 31, 2004, IBEW filed a motion for summary judgment regarding the issue of fair representation. IBEW's argument is twofold: (1) it owes no duty of fair representation to Carr; and (2) even if it does owe such a duty, Carr's fair repre-

sentation claim is untimely. Local 1593 filed a motion for summary judgment on the issue of fair representation on February 1, 2004. While Local 1593 concedes that it owes a duty of fair representation to Carr, it echoes IBEW's contention that the claim is untimely. Further, Local 1593 asserts that if the Court were to consider Carr's fair representation claim, it has no legal merit.

### II. LEGAL DISCUSSION

#### A. STANDARD FOR SUMMARY JUDGMENT

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Graning v. Sherburne County,* 172 F.3d 611, 614 (8th Cir.1999). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376 (8th Cir.1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that

lective bargaining agreement by reducing

Carr's pay grade from Tech III to Tech I.

there are genuine issues for trial. Fed. R.Civ.P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. THE DUTY OF FAIR REPRE-SENTATION

### 1) DIRECT OR INDEPENDENT LIA-BILITY

A union's duty of fair representation rises out of the exclusive power granted unions by Section 9(a) of the National Labor Relations Act, which states in relevant part as follows:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment....

29 U.S.C. § 159(a). "[E]xclusive representation is a necessary prerequisite to a statutory duty to represent fairly." *McCormick v. Aircraft Mechanics Fraternal Ass'n,* 340 F.3d 642, 645 (8th Cir.2003) (quoting *Kuhn v. Nat'l Ass'n of Letter Carriers, Branch 5,* 528 F.2d 767, 770 (8th Cir.1976)). As stated by the United States Supreme Court,

> It is now well established that, as the exclusive bargaining representative of the employees in (an employer's) bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with Swift and in its enforcement of the resulting collective bargaining agreement. The statutory duty of fair repre-

sentation was developed over 20 years ago in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act and was soon extended to unions certified under the N.L.R.A. Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (internal citations omitted); *see Wells v. Railway Conductors,* 442 F.2d 1176, 1179 (7th Cir.1971) ("the duty of fair representation flows from the majority union's status as a statutorily recognized exclusive bargaining agent."). For that reason, "international unions are routinely dismissed from duty of fair representation suits when they are neither the recognized collective bargaining representative nor a party to their contract." *Borg v. Greyhound, Inc.,* No. C 83–4827 RHS, 1984 WL 14332, *3 (N.D.Cal.1984) (citations omitted). To that end, numerous federal courts have dismissed fair representation actions against international unions. *See Tongay v. Kroger Co.,* 860 F.2d 298, 299 (8th Cir.1988); *Sine v. Local 992, Int'l Bhd. of Teamsters,* 730 F.2d 964, 966 (4th Cir.1984) ("Where, as here, the local is designated as the exclusive bargaining agent responsible for representing employees in the prosecution of grievances, only the local can be held responsible."); *Baker v. Newspaper and Graphic Communications,* 628 F.2d 156, 165 (D.C.Cir.1980) ("[T]he International was neither the bargaining representative nor a party to the collective bargaining agreement. Under these circumstances, there is no basis for impaling the Interna-

tional on the horns of the dilemma faced by the Local."); *Teamsters Local Union No. 30 v. Helms Exp. Inc.*, 591 F.2d 211, 217 (3d Cir.1979); *Sinyard v. Foote & Davies Div. of McCall Corp.*, 577 F.2d 943, 947 (5th Cir.1978); *Ruzicka v. General Motors Corp.*, 523 F.2d 306, 309 (6th Cir. 1975); *Doss v. Int'l Bhd. of Teamsters*, 140 F.Supp.2d 1304, 1309 (M.D.Fla.2001); *Rigby v. Coughlin*, 730 F.Supp. 1196, 1198 (N.D.N.Y.1990); *Larry v. Penn Truck Aids, Inc.*, 94 F.R.D. 708, 721–722 (E.D.Pa. 1982); *Neiger v. Sheet Metal Workers Int'l Ass'n, AFL–CIO*, 470 F.Supp. 622, 629–30 (W.D.Mo.1979); *Nunnally v. Int'l Bhd. of Elec. Workers*, 588 F.Supp. 1309, 1313 (D.Mont.1984).

■ Based on the foregoing, IBEW contends that Carr's fair representation claim against it must be dismissed because IBEW was neither a signatory to the collective bargaining agreement, nor the exclusive bargaining representative of Dakota Gasification employees. Despite the case law, Carr disagrees. Instead, Carr asserts that IBEW is "directly liable" because James Simmons, an IBEW representative, was present during contract negotiations.

■ IBEW admits that Simmons "assisted" and "offered advice" to Local 1593 during negotiations. *See* IBEW Statement of Material Facts, ¶ 5. In that regard, Gary Leinius, former business manager/financial secretary of Local 1593 attested to the following:

> At Local 1593's request, James Simmons, an IBEW International Representative assisted Local 1593 in those negotiations. Simmons attended some, but not all of the negotiation session (sic) between Local 1593 and DGC. Simmons offered advice to Local 1593. He did not issue directives regarding what Local 1593 should propose, reject or accept in collective bargaining.
>
> . . .

> The decision to sign the agreement was made by Local 1593's negotiating committee. James Simmons did not instruct me to sign the agreement.

Declaration of Gary Leinius, ¶ 7. Carr contends that Simmons played a much larger role, as stated in his brief:

> It is undisputed that the International representative and the Local representative attended the "secret" meeting that was held on June 28, 2001, negotiated and modified the contract without the knowledge of the negotiating committee and without authority from the members of Local, added Exhibit C, signed that agreement, and forwarded it to the president of the International for his approval.

Plaintiff's Response to Motion for Summary Judgment, pp. 5–6. However, Carr cites no support for his potentially damning allegations. In response, IBEW correctly notes that an international union does not owe a duty of fair representation merely by taking part in the negotiation process. *See Walters v. Roadway Express, Inc.*, 400 F.Supp. 6, 14–16 (S.D.Miss. 1975) (finding the international union owed no duty of fair representation by merely participating in negotiations at which the local union was the exclusive bargaining agency); *Borg v. Greyhound, Inc.*, No. C 83–4827 RHS, 1984 WL 14332, *3 (N.D.Cal.1984) (finding the international union owed no duty of fair representation even when its vice president assisted in negotiations and signed the collective bargaining agreement).

The Court expressly finds that IBEW owes no independent duty of fair representation to Carr, as it did not sign the collective bargaining agreement, or assume the role of exclusive bargaining representative for Dakota Gasification employees. Further, IBEW owes no independent duty of fair representation based on the actions of

James Simmons. In the alternative, Carr argues that IBEW has vicarious liability.

## 2) *VICARIOUS LIABILITY*

■ The United States Supreme Court has recognized that common law principles of agency govern whether an international union is liable for the actions of a local chapter or its officers. *See Carbon Fuel Co. v. United Mine Workers of America,* 444 U.S. 212, 216–217, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979) (applying the common law principles to determine whether an international union was liable for an unauthorized strike by one of its locals). "A principal-agent relationship may not be inferred solely from affiliation between an international union and a local union." *Scott v. Graphic Communications Int'l Union, Local 97–B,* 92 Fed.Appx. 896, 904 (3d Cir.2004) (citing *Carbon Fuel,* 444 U.S. 212, 217, 100 S.Ct. 410, 62 L.Ed.2d 394; *Coronado Coal Co. v. United Mine Workers,* 268 U.S. 295, 304–05, 45 S.Ct. 551, 69 L.Ed. 963 (1925); *United Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 395, 42 S.Ct. 570, 66 L.Ed. 975 (1922)); *see Shimman v. Frank,* 625 F.2d 80, 97 (6th Cir. 1980) ("The International Union is a separate body from the local. The acts of the local and its agents cannot automatically be imputed to the International."). Common-law principles dictate that "if the local engages in illegal conduct in furtherance of its role as an agent of the international, the international will be liable for the local's actions." *Laughon v. Int'l Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists & Allied Crafts of the United States and Canada,* 248 F.3d 931, 935 (9th Cir.2001) (citing *Carbon Fuel,* 444 U.S. 212, 217, 100 S.Ct. 410, 62 L.Ed.2d 394)). "However, if the local exercises considerable autonomy in conducting its affairs, it cannot be regarded as an agent of the international, and the international accordingly cannot be held liable under an agency theory for the local's actions." *Id.* (citing *Shimman,* 625 F.2d 80, 97–98). Stated another way, "without evidence that [the International] instigated, supported, ratified or encouraged the Local's activities or the Local acted pursuant to its agreement with the International, there [is] no agency relationship as a matter of law." *Moore v. Local Union 569 of the Int'l Bhd. of Electrical Workers,* 989 F.2d 1534, 1543 (9th Cir.1993); *see Wentz v. Int'l Bhd. of Electrical Workers,* 578 F.2d 1271, 1273 (8th Cir.1978) ("Under ordinary rules of agency, International is not liable for acts of Local 1525 which it has not authorized or ratified."); N.D. Cent Code § 3–01–06 ("An agency may be created and an authority may be conferred by a prior authorization or a subsequent ratification").

### a. *CONTROL*

"What should matter is not so much the International's theoretical control over the local as the nature and extent of the actual control." *Laughon v. Int'l Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists & Allied Crafts of the United States and Canada,* 248 F.3d 931, 935 (9th Cir.2001) (citations omitted). "To analyze the actual relationship, we consider the local's election of its own officers, ability to hire and fire its own employees, maintenance of its own treasury and independent conduct of its daily business as determinative factors." *Id.* (citing *Childs v. Local 18, Int'l Bhd. of Elec. Workers,* 719 F.2d 1379, 1382 n. 2 (9th Cir.1983)). To conduct such an analysis, courts often refer to the terms of the union's constitution and by-laws. *See id.; Switalski v. Int'l Association of Bridge, Structural and Ornamental Iron Workers, Local Union No. 3,* 881 F.Supp. 205, 209 (W.D.Pa.1995); *United States v. Int'l Bhd. Of Teamsters,* 728 F.Supp. 1032, 1052 (S.D.N.Y.1990); *Boss v. Int'l Bhd. of Boilermakers,* 567 F.Supp. 845, 847 (N.D.N.Y. 1983).

Several courts have declined to impose liability upon IBEW under agency principles due to the independent nature of its locals. *See Childs v. Local 18, Int'l Bhd. of Elec. Workers*, 719 F.2d 1379, 1382–83 (9th Cir.1983) (finding no liability for IBEW on an agency theory whereby an affiliated local union operated autonomously); *E.E.O.C. v. Int'l Bhd. of Elec. Workers*, 476 F.Supp. 341 (D.Mass.1979). Most persuasive is a case cited by IBEW entitled *E.E.O.C. v. Int'l Bhd. of Elec. Workers, Local 998*, No. 3:02CV7374, 2005 WL 469600, 2005 U.S. Dist. LEXIS 2954 (N.D.Ohio Feb. 28, 2005), in which the plaintiff tried unsuccessfully to argue that IBEW is merely an alter ego of Local 998, and therefore liable to the extent of the Local. The argument was based on the following:

1. As a member of Local 998 and employee of Lithonia, Newman was automatically a member of International;

2. Ten dollars of Newman's monthly dues to Local 998 of $19.95 went to the International;

3. Local 998 and its members are subject to the International's Constitution and its provisions relating to local unions, including their charters, officers, and duties;

4. By-laws adopted by local unions, including Local 998, followed a pattern provided by the International, and became valid only when approved by the International; and

5. Collective bargaining agreements between local unions and employers likewise were not effective until approved by the International.

*Id.*, 2005 WL 469600, at *2, 2005 U.S. Dist. LEXIS 2954, at *3–4. Other facts included the "[a]ttendance by representatives of the International at negotiating sessions between Local 998 and Lithonia," as well as "[p]articipation by an official from International, Mr. Cook, in two arbitrations, and his presentation of cases for grievant and authorship of briefs." *Id.*, 2005 WL 469600, at *2, 2005 U.S. Dist. LEXIS 2954, at *at 5. For those reasons, the plaintiff argued that IBEW is not a legally distinct entity apart from its local thereby rendering it liable for any unlawful acts committed by the local.

The Court rejected the contention that such facts create an agency relationship:

Neither the general attributes, based in the International's Constitution, of the International's relationship with Local 998 nor its specific activities on behalf of Local 998 show that there was an agency relationship between the two entities. Requiring conformity to some general requirements, as prescribed by the International's Constitution, did not subject either the general or daily operations of Local 998 to the International's control.

Likewise, the fact that the International or its representatives attended some negotiating sessions, gave advice about collective bargaining, assisted in arbitrations, resolved internal disputes within the Local 998, and provided modest financial assistance did not dissolve the legal distinction between the Local 998 and the International. There is nothing to indicate that the International's assistance made it dominant, or enable it to dictate how the Local went about its work for Lithonia's employees. That the International provided service did not make it Local 998's servant, or vice-versa.

*Id.*, 2005 WL 469600, at *3, 2005 U.S. Dist. LEXIS 2954, at *8–10.

Not surprisingly, the structure and regulations of Local 1593 are similar to those of the local union described in *E.E.O.C. v. Int'l Bhd. of Elec. Workers, Local 998*. The uncontroverted evidence reveals that

Local 1593 is largely an independent legal entity. Edwin Hill, the current International President of IBEW explained:

> IBEW affiliated unions, such as Local 1593, are separate and autonomous entities that conduct their own day-to-day affairs. IBEW local unions elect their own officers, conduct their own elections, and determine for themselves what their local union officers will be paid. They adopt their own bylaws, conduct their own membership meetings, and determine for themselves where and when the meetings will be conducted. They appoint their own job stewards, process their own grievances and negotiate their own collective bargaining agreements. They determine for themselves whether and how their collective bargaining agreements will be ratified. They establish and collect their own dues, and they maintain and control their own bank accounts. They admit and, on occasion, discipline their own members. They make their own purchases, audit their own books, and hold title to their own property. They hire and pay their own employees. They file reports on their own behalf—including

the Labor Organization Annual Report or LM–2—with the United States Department of Labor.

Second Declaration of Edwin D. Hill, ¶ 3. Gary Leinius, former business manager/financial secretary of Local 1593, mimics Hill's remarks:

> Local 1593 runs its own day-to-day affairs. It admits its own members and conducts its own meetings. It elects and pays its own officers. It adopts its own bylaws, negotiates its own collective bargaining agreements and processes its own grievances. Local 1593 retains and pays its own attorneys. It collects its own dues and pays its own bills. It controls its own funds and owns its own property, And, it files its own LM–2 reports with the United States Department of Labor.

Declaration of Gary Leinius, ¶ 3. More to the point, Leinius stated that "[n]o officer or employee of Local 1593 has ever agreed to act on behalf of, or subject to the control of, the IBEW." Declaration of Gary Leinius, ¶ 4.

 The Court finds that IBEW does not have the requisite control over Local 1593 to establish an agency relationship.[4]

---

4. In Carr's discussion of agency liability he states as follows:

> We assert that the common law principles of agency and partnership result in the International and Local being jointly and severely liable in this case. The International and the Local, through their paid representatives, acted in concert in regards to attending and participating in the secret meeting, modifying the contract, and signing the contract. The International representative held himself out to the company as an agent of the Local membership both by his conduct and communication. The International admits that its representative was at the time of the meeting employed by the International and under the control and authority of the International. The International therefore served as an agent to the Local and as an agent to the membership of

the Local by inveighing itself into the secret negotiations.

Plaintiff's Response to Motion for Summary Judgment, pp. 8–9. Carr invokes the doctrine of apparent or ostensible authority to further his position.

As stated by the North Dakota Supreme Court, "[a]n apparent or ostensible agency must rest upon conduct or communications of the principal which, reasonably interpreted, causes a third person to believe that the agent has authority to act for and on behalf of the principal." *Argabright v. Rodgers*, 659 N.W.2d 369, 371 (N.D.2003) (citing *Krank v. A.O. Smith Harvestore Products, Inc.*, 456 N.W.2d 125, 128 (N.D.1990)); *see* N.D. Cent. Code § 3–01–03; N.D. Cent.Code § 3–02–03. A plain reading of the doctrine reveals that Carr's argument is somewhat misplaced. Carr asserts that the actions of IBEW render it the agent of Local 1593. However, for

The fact that James Simmons attended certain negotiation sessions does not alter that conclusion. *See Walters v. Roadway Express, Inc.,* 400 F.Supp. 6, 14–16 (S.D.Miss.1975) ("The most that the evidence shows is that the International participated in effectuating the Collective Bargaining Agreement but did not undertake to represent the plaintiffs as their bargaining agent.... Thus, the plaintiffs have failed to prove a case against the [International]."). However, Carr contends that "there is substantial evidence that [IBEW] authorized and ratified the misconduct" of Local 1593. If true, IBEW may still be liable.

### b. *AUTHORIZATION*

■ Article XV, Section 24 of the IBEW Constitution provides as follows:

> No [Local Union], or its officers, employees or representatives, is authorized to act on behalf of the I.B.E.W., or shall be deemed an agent of the I.B.E.W., except upon specific authorization granted by the [International President].

President Hill stated, "Neither I, nor any other representative of the IBEW, has ever authorized Local 1593, or any officer or employee of Local 1593, to act as an agent of the IBEW." Second Declaration of Edwin D. Hill, ¶ 8. This is corroborated by the statement of Gary Leinius, "To my knowledge, neither the IBEW International President, nor any other representative of the IBEW has ever authorized Local 1593, or any officer or employee of Local 1593, to take any action on behalf of the IBEW." Declaration of Gary Leinius, ¶ 4.

Further, President Hill clearly establishes that James Simmons was not au-thorized to instruct Local 1593. Second Declaration of Edwin D. Hill, ¶¶ 4–5. Hill explained the duties of International Representatives such as James Simmons:

> The IBEW employs several International Representatives, whose duties include providing advice and assistance to local unions, but only when such advice and assistance is requested. An International Representative may offer a local union advice on collective bargaining, on contract enforcement or on various internal union questions.
>
> The authority of International representatives is strictly limited. They can advise, but not direct. Local unions decide for themselves what proposals to offer, accept or reject in collective bargaining.

Second Declaration of Edwin D. Hill, ¶¶ 4–5.

The Court previously discussed Simmons minimal role at the negotiations.

> At Local 1593's request, James Simmons, an IBEW International Representative assisted Local 1593 in those negotiations. Simmons attended some, but not all of the negotiation session (sic) between Local 1593 and DGC. Simmons offered advice to Local 1593. He did not issue directives regarding what Local 1593 should propose, reject or accept in collective bargaining.
>
> . . .
>
> The decision to sign the agreement was made by Local 1593's negotiating committee. James Simmons did not instruct me to sign the agreement.

Declaration of Gary Leinius, ¶ 7. Carr can point to no evidence showing that Simmons was authorized by IBEW to direct

---

purposes of Carr's apparent authority argument, IBEW must be the principal. As the definition reveals, apparent authority can only arise in situations where "the principal intentionally or by want of ordinary care causes a third person to believe another to be his agent, who really is not employed by him." *Id.* It is clear that James Simmons is employed by IBEW, and is an agent of IBEW. However, he was not authorized to direct Local 1593 decisions.

Local 1593 decisions. By his own admission, Carr only recalled seeing Simmons "at a couple things." Deposition of Michael Carr, p. 48.

The Court finds that IBEW never authorized Local 1593 or any of its employees to act on its behalf. In addition, James Simmons was not authorized by IBEW to direct Local 1593 during contract negotiations. As a result, liability cannot be attached to IBEW by way of authorization.

#### c. RATIFICATION

"[R]atification can only occur when the principal, having knowledge of the material facts involved in the transaction, evidences an intention to ratify." *Redonich v. House Wreckers Union Local 95 of Laborers' Int'l Union,* 817 F.2d 967, 973 (2d Cir. 1987) (citations omitted); *see* Restatement (Second) of Agency, § 82 ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.").

■ Carr seems to suggest that IBEW ratified the alleged wrongful conduct of Local 1593 by later approving the collective bargaining agreement. However, Article XV, Section 6 of the IBEW Constitution states the contrary:

> Approval of [Local Union] collective bargaining agreements by the [International President] does not make the International a party to such agreement unless the [International President] specifically states in writing that the International is a party to such an agreement.

International President Edwin Hill explained the approval process:

> When local union collective bargaining agreements are sent in for approval,

they are reviewed primarily to determine whether they contain any provisions that appear to be unlawful or that improperly make the IBEW a party or require the IBEW to participate in the grievance procedure. The IBEW does not review local union agreements to determine whether the local union has struck a good deal with the employer or whether the local union has adequately represented the employees covered by the agreement.

Second Declaration of Edwin D. Hill, ¶ 11. Hill admits that he signed the collective bargaining agreement between Dakota Gasification and Local 1953, but did nothing more. The Court finds that Hill's conduct falls far short of what is required for ratification.

In conclusion, the Court finds that IBEW owes no direct or independent duty of fair representation to Carr. IBEW was neither the signatory to the collective bargaining agreement, nor Dakota Gasification employees' exclusive bargaining representative. Further, the Court finds that IBEW cannot be held liable through common law principles of agency. As a result, there are no genuine issues of material fact to be resolved by a jury with respect to Carr's fair representation claim against IBEW.

#### C. SIX–MONTH STATUTE OF LIMITATIONS

■ Section 10(b) of the National Labor Relations Act imposes a six-month limitations period for making charges of unfair labor practices to the National Labor Relations Board (NLRB). 29 U.S.C. § 160(b). In *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 170–72, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the United States Supreme Court held that the six-month period applied equally to fair representation claims.[5] In doing so, the Court

---

**5.** In *DelCostello,* the United States Supreme Court evaluated a so-called "hybrid" claim.

noted that "[t]he NLRB has consistently held that all breaches of a union's duty of fair representation *are* in fact unfair labor practices." *Id.* at 170, 103 S.Ct. 2281 (citing *Miranda Fuel Co.*, 140 N.L.R.B. 181 (1962)). Due to the undeniable "family resemblance" and "substantial overlap" of the two claims, the Court found application of the six-month statute of limitation appropriate in fair representation claims. *Id.*

 It is well-established that "[t]he statute of limitations begins running when the employee 'should reasonably have known of the union's alleged breach.'" *Scott v. United Automobile,* 242 F.3d 837, 839 (8th Cir.2001) (citing *Evans v. Northwest Airlines, Inc.,* 29 F.3d 438, 441 (8th Cir.1994)). Carr commenced this action on February 14, 2004.[6] Therefore, any claim for breach of the duty of fair representation arising out of acts which occurred on or before August 14, 2003, is untimely and subject to dismissal.

### 1) ALLEGED VIOLATIONS

The complaint outlines numerous allegations upon which Carr's fair representation is based. *See* Complaint, ¶¶ 1–20. The Court will address each alleged violation in relation to the six-month statute of limitations.

### a. SECRET MEETING

 Carr contends that a "secret meeting" was held on June 28, 2001, between Dakota Gasification and Local 1593.

At the meeting, Carr alleges that changes were secretly made to the agreement, namely the addition of Exhibit C. *See* Complaint, ¶ 5. Carr did not know about the meeting on the date of its occurrence, but admits to learning about the meeting on or before March 3, 2003. Deposition of Michael Carr, at 50–51. This allegation falls outside of the six-month statute of limitation and must be dismissed.

### b. COLLECTIVE BARGAINING AGREEMENT

The collective bargaining agreement between Dakota Gasification and Local 1593 was executed on July 10, 2001. Carr alleges that Local 1593 violated its duty of fair representation by entering into the agreement. This allegation falls outside of the six-month statute of limitations and must be dismissed.

### c. LETTERS FROM LOCAL 1593

 In July and August of 2001, Local 1593 sent letters to all represented Dakota Gasification employees. Carr claims that Local 1593 made certain misrepresentations in those letters. Carr understood the letters to state that Dakota Gasification would be precluded from changing company policy, to include wages, pay rates, working hours and working conditions, without first negotiating with Local 1593. *See* Complaint, ¶ 11. On April 25, 2003, an arbitrator denied Carr's first grievance, holding that Dakota Gasification was entitled to change company policy

---

*Id.* at 164–65, 103 S.Ct. 2281. A hybrid claim is one comprised of two separate actions: (1) a Section 301 suit against the employer alleging a breach of the collective bargaining agreement, and (2) a suit against the union for breach of the union's duty of fair representation. However, the limitation period also applies to fair representation actions filed against only the union. *See Skyberg v. Food and Commercial Workers,* 5 F.3d 297, 301 (8th

Cir.1993); *Witt v. Roadway Express,* 136 F.3d 1424, 1430 (10th Cir.1998).

**6.** IBEW was served with a summons and complaint on February 14, 2004, and Local 1593 was served with a summons and complaint on February 15, 2004. The action was originally filed in state District Court, Mercer County, but subsequently removed to the federal District Court for the District of North Dakota. *See* Docket No. 1.

without first negotiating with Local 1593 based primarily on Exhibit C of the collective bargaining agreement. At that time, Carr knew or should reasonably have known that the information contained in the Local 1593, as he understood it, was incorrect. This allegation falls outside of the six-month statute of limitations and must be dismissed.

### d. CARR'S FIRST GRIEVANCE

■ On March 28, 2002, Local 1593 filed a grievance on Carr's behalf alleging that Dakota Gasification violated the collective bargaining agreement by reducing his pay grade from Tech V to Tech III. The grievance was denied in Steps One, Two, and Three. Carr then requested an arbitration hearing and a hearing was held on March 5, 2003. *See* Complaint, ¶ 13. As previously mentioned, the grievance was denied on April 25, 2003. Carr alleges that Local 1593 mishandled the arbitration hearing. On that date, Carr knew or should reasonably have known that he had a potential claim against Local 1593. *See Bonds v. Coca–Cola Co.*, 806 F.2d 1324, 1326 (7th Cir.1986) ("the date of the arbitrator's decision is the critical one for purposes of *DeCostello*, because on that date the employees *knew or could discover* that they have a claim against their union."). This allegation falls outside of the six-month statute of limitations and must be dismissed.

### e. CARR'S SECOND GRIEVANCE

■ On March 24, 2003, Local 1593 filed a second grievance on Carr's behalf alleging that Dakota Gasification violated the collective bargaining agreement by reducing his pay grade from Tech V to Tech III. After the arbitrator's decision in April of 2003, Local 1593 decided not to pursue

arbitration with regard to the second grievance. Carr admits that both grievances raised essentially the same issue, but asserts that Local 1593 failed to adequately represent him. Deposition of Michael Carr, p. 143. Within ten days of April 25, 2003, Carr knew that Local 1593 was not going to process his second grievance to arbitration.[7] Deposition of Michael Carr, p. 144. Accordingly, Carr knew he had a potential claim against Local 1593 on that date. *See Cook v. Columbian Chemicals Co.*, 997 F.2d 1239, 1241 (8th Cir.1993) (holding that cause of action accrued on "the last day that arbitration could have been timely requested"); *Tripp v. Angelica Corp.*, 921 F.2d 794, 795 (8th Cir.1990) (citing *Gustafson v. Cornelius*, 724 F.2d 75, 79 (8th Cir.1983)) ("claim arises on the date the union decides not to pursue the employee's grievance"). This allegation falls outside of the six-month statute of limitations and must be dismissed.

### f. SICK LEAVE AND VACATION POLICY

■ In February and March of 2003, Dakota Gasification refused Carr's request to convert his vacation leave to sick leave. Instead, Dakota Gasification asked Carr to produce additional information about his illness, a request that Carr claims only applied to him. Carr never provided the requested information and did not request that Local 1593 grieve the decision, or file a grievance himself. Deposition of Michael Carr, pp. 114–15; Declaration of Nate Corbin, ¶ 5; Declaration of Gary Leinius, ¶ 16. Carr alleges that Local 1593 did not adequately protect his rights or take steps to prevent the unequal treatment. *See* Complaint, ¶ 16. It is unclear how Local 1593 could violate its duty of

---

7. Under the collective bargaining agreement, Local 1593 had ten days to request arbitration after a Step Three denial. Carr was aware of the ten-day deadline. Deposition of Michael Carr, p. 143.

fair representation under such circumstances, but the deadline for filing grievances under the collective bargaining agreement is sixty days. After that time period, approximately May of 2003, Carr knew or should have known that he had a potential claim against Local 1593 based on their failure to pursue the issue. This allegation falls outside of the six-month statute of limitations and must be dismissed.

### g. *WORK APPRAISAL*

In May of 2003, Dakota Gasification gave Carr his work appraisal. The appraisal, dated May 18, 2003, gave Carr an overall evaluation rating of "Needs Improvement." Carr saw the evaluation as a threat from management, but did not ask Local 1593 to file a grievance on the issue. Declaration of Gary Leinius, ¶ 17. Carr alleges that Local 1593 did not adequately protect his rights or properly protect him from Dakota Gasification. *See* Complaint, ¶ 19. Again, within sixty days of the appraisal, Carr knew or should have known that he had a potential claim against Local 1593 based on their failure to pursue the issue. This allegation falls outside of the six-month statute of limitations and must be dismissed.

### h. *ADVANCEMENT POLICY*

On September 10, 2003, Dakota Gasification announced a change in policy, explaining that operations technicians would be expected to progress through various pay grades in a specific amount of time. Failure to do so could result in disciplinary action. *See* Complaint, ¶ 20. Local 1593 did not pursue a grievance of this policy decision because it did not believe the policy violated the collective bargaining agreement and few members found the policy objectionable. More important, Carr admitted that he did not ask Local 1593 to file a grievance nor did he file his own grievance against Dakota Gasification concerning the change. Deposition of Michael Carr, p. 126; Declaration of Gary Leinius, ¶¶ 18–19. This is the only allegation that falls within the six-month statute of limitations.

### 2) *CONTINUING VIOLATION*

As explained, all but one of Carr's allegations are untimely. In an attempt to fend off dismissal, Carr contends that the six-month statute of limitations has not yet run because Local 1593's actions constitute a continuing violation.[8] In other words, because Carr is still suffering harm as a result of the collective bargaining agree-

8. The foundation for Carr's continuing violation argument is as follows:
1. Exhibit C was improperly inserted into the contract without the approval of the membership and Exhibit C remains to this date in the contract;
2. Mike Carr is, on a daily basis, receiving less pay due to the misconduct alleged;
3. The defendants' (sic) have failed to take appropriate actions to remedy the misconduct (despite the Local's ability to demand the contract be re-opened and the International's ability to address the matter through the International Vice President's authority);
4. The signing and approving the contract without a vote of the membership constitutes a continuing wrong and is an act that is a continuing violation of the International's duty "to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct";
5. The defendants failed to require a vote or to re-open negotiations for the purpose of deleting Exhibit C acts as a continuing unfair labor practice and acts as a continuing interference with the employees' free choice; and
6. The defendants are presently committing an unfair labor practice by refusing to all Mike Carr to re-join the union in violation of his rights under labor law as well as his first amendment rights of freedom of association and freedom of speech.
Plaintiff's Response to Motion for Summary Judgment, pp. 10–11 (footnotes omitted).

ment and no action has been taken by Local 1593 or IBEW, any alleged violation is ongoing.

The continuing violations doctrine was expressly rejected by the United States Supreme Court in *Local Lodge No. 1424 v. N.L.R.B.*, 362 U.S. 411, 417–423, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). In *Local Lodge No. 1424*, the execution of a collective bargaining agreement was unlawful because it was signed by a union which did not represent a majority of the employees. An action was filed against the union 10 months and 12 months after execution of the agreement. The United States Supreme Court held that the action was barred by the six-month statute of limitation imposed by Section 10(b) of the National Labor Relations Act. In doing so, the Court stated as follows:

[A] finding of a violation which is inescapably grounded on events predating the limitations period is directly at odds with the purposes of the s 10(b) proviso. The applicability of these principles cannot be avoided here by invoking the doctrine of continuing violation.

. . .

[I]f the s 10(b) proviso is to be given effect, the enforcement, as distinguished from the execution, of such an agreement as this constitutes a suable unfair labor practice only for six months following the making of the agreement.

*Id.* at 422–23, 80 S.Ct. 822. The Court warned, "where a complaint based upon [an] earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice." *Id.* at 417, 80 S.Ct. 822.

The doctrine has been similarly disfavored among circuit courts of appeal and district courts in fair representation ·actions when the referenced event occurred outside the six-month statute of limitations. *See Tapia v. Local 11 Hotel Employees & Restaurant Employees Union*,

No. CV–99–09922–FMC, 2001 WL 630260 (9th Cir. Jun.6, 2001); *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 915–16 (7th Cir.1999) ("The effects of that failure may still have been felt in 1996, but that does not render the company's decision a continuing violation."); *Washington v. Service Employees Int'l Union, Local 50*, 130 F.3d 825, 826 .(8th Cir.1997); *Noble v. Chrysler Motors Corp., Jeep Division*, 32 F.3d 997, 1001 (6th Cir.1994); *Livingstone v. Schnuck Market, Inc.*, 950 F.2d 579, 583 (8th Cir.1991); *Adams v. Budd Co.*, 846 F.2d 428, 431 (7th Cir.1988) ("continued union inactivity after an initial failure to respond to a grievance request does not constitute a continuing violation of the duty of fair representation."); *Harper v. San Diego Transit Corp.*, 764 F.2d 663, 669 (9th Cir.1985); *Metz v. Tootsie Roll Ind.*, 715 F.2d 299, 305–06 (7th Cir.1983); *Devitt v. Potter*, 234 F.Supp.2d 1034, 1042 (D.N.D.2002) ("it is well settled that the continuing violations doctrine is not applicable in duty of fair representation cases.").

■ Having carefully reviewed the relevant case law, it is clear that Carr's invocation of the doctrine of continuing violations is neither appropriate nor warranted. Carr may not base his fair representation claim on events which took place outside the six-month statute of limitations, such as the signing of the collective bargaining agreement which took place on July 10, 2001. While Carr may still suffer lingering harm as a result of that agreement, any fair representation claim arising out of that agreement expired six months after its execution. It is clear and well-established that Carr may not circumvent the six-month statute of limitations by asserting a continuing. violation. The Court finds that Carr's allegations which fall outside the six-month statute of limitations must be dismissed as untimely.

### D. BREACHING THE DUTY OF FAIR REPRESENTATION

"A union breaches its duty to fairly represent one of its members when its conduct is arbitrary, discriminatory, or in bad faith." *Martin v. American Airlines, Inc.*, 390 F.3d 601, 606 (8th Cir.2004) (citing *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). "Arbitrary conduct is 'behavior [that] is so far outside a "wide range of reasonableness" as to be irrational.'" *Id.* (citing *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953))). To prove arbitrariness, the employee must show "fraud, deceitful action, or dishonest conduct." *Baxter v. United Paperworkers Int'l Union, Local 7370*, 140 F.3d 745, 747 (8th Cir.1998) (citing *Washington v. Service Employees Int'l Union, Local 50*, 130 F.3d 825, 826 (8th Cir.1997)). Whereas, "[m]ere negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation." *Buford v. Runyon*, 160 F.3d 1199, 1202 (8th Cir.1998) (citing *Smith v. United Parcel Serv., Inc.*, 96 F.3d 1066, 1068 (8th Cir.1996)). The United States Supreme Court as advised that "[a]ny substantive examination of a union's performance ... must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (citing *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469 (1952); *United States v. Carolene Products*, 304 U.S. 144, 154, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)). As a result, "the final product of the bargaining process may constitute evidence of a breach of duty only if it can fairly be characterized as so far outside a 'wide range or reasonableness,' that is wholly 'irrational' or 'arbitrary.'" *Id.*

(quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) (internal citation omitted)).

 Carr's only remaining allegation of wrongdoing stems from the implementation of the advancement policy on September 10, 2003. As previously noted, Local 1593 did not pursue a grievance of this policy decision because it did not consider the policy to be a violation of the collective bargaining agreement, and few members of Local 1593 considered the policy objectionable. Declaration of Gary Leinius, ¶ 19. In fact, Carr himself did not grieve the policy decision, nor request that Local 1593 grieve the policy for him. Deposition of Michael Carr, p. 126; Declaration of Gary Leinius, ¶¶ 18–19.

Based on this undisputed evidence, it cannot be shown that Local 1593 acted arbitrary, discriminatory, or in bad faith. Carr does not dispute Local 1593's rationale for failing to pursue a grievance of the policy. Nor can Carr dispute the fact that he took no action to pursue such a grievance. In light of the "highly deferential" standard of review, the Court finds that Local 1593 did not breach its duty of fair representation to Carr by choosing not to grieve the implementation of the advancement policy. Finally, it should be noted that even if IBEW owed Carr a duty of fair representation, all his claims have been found to be untimely or without merit.

### III. CONCLUSION

In summary, the Court finds that IBEW owes no duty of fair representation to Carr, either directly or vicariously. IBEW and Local 1593 are separate legal entities and no agency relationship exists between the two entities. As a result, IBEW's Motion for Summary Judgment (Docket No. 51) is **GRANTED.** The Court also finds that Carr's allegations

regarding the duty of fair representation against Local 1593 are untimely or without merit. For that reason, Local 1593's Motion for Summary Judgment (Docket No. 53) is **GRANTED.** IBEW's Motion to Strike (Docket No. 66) is **DENIED** as moot.

IT IS SO ORDERED.